ADAM L. BRAVERMAN
United States Attorney
JANET A. CABRAL (Cal. Bar No. 168900)
AMANDA L. GRIFFITH (Cal. Bar No. 243854)
Assistant United States Attorneys
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-8715/8970
Email: janet.cabral@usdoj.gov/mandy.griffith@usdoj.gov

Attorneys for the United States of America

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18cr1805-BAS |
| Plaintiff, | |
| v. | UNITED STATES' TRIAL MEMORANDUM |
| ISAIAH SMALLWOOD JACKSON, | Trial Date: October 23, 2018 |
| Defendant. | Time: 9:00 a.m. |

Comes now the plaintiff, United States of America, through its counsel, Adam L. Braverman, United States Attorney, and Janet A. Cabral and Amanda L. Griffith, Assistant United States Attorneys, and files its trial memorandum.

## I.

## STATEMENT OF THE CASE

### A.    Indictment

On April 4, 2018, the grand jury returned an Indictment charging defendant as follows:

### Count 1

On or about September 17, 2017, within the Southern District of California, defendant ISAIAH SMALLWOOD JACKSON, did employ, use,

persuade, induce, entice, and coerce a minor, to wit, MV-1, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, knowing and having reason to know such visual depiction would be transmitted using a means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce, and the visual depiction was produced and transmitted using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce, and the visual depiction was actually transported and transmitted using a means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce; in violation of Title 18, United States Code, Section 2251(a) and (e).

<u>Count 2</u>

On or about September 16 and 17, 2017, within the Southern District of California, defendant ISAIAH SMALLWOOD JACKSON, did, using a facility and means of interstate and foreign commerce, knowingly persuade, induce, entice, and coerce an individual who had not attained the age of 18 years, to-wit, MV-1, to engage in any sexual activity for which any person can be charged with a criminal offense, to wit: California Penal Code 288a, oral copulation with a person under the age of 18; in violation of Title 18, United States Code, Section 2422(b).

Defendant was arraigned on the Indictment and entered a plea of not guilty. On September 21, 2018, a Superseding Indictment was returned, which alleged an additional violation of California Penal Code 289(h), digital penetration with a person under the age of 18, in Count 2.

**B.    Trial Status**

A jury trial is set before the Honorable Cynthia Bashant for October 23, 2018. The United States expects its case-in-chief to last two days.

**C.    Defense Counsel**

Defendant is represented by appointed counsel, Debra DiIorio.

**D.    Defendant's Custody Status**

Defendant has been in custody since his arrest on October 27, 2017, on a Complaint filed in Case No. 17cr3929-BAS.

**E.    Interpreter**

The United States does not require the assistance of an interpreter.

**F.    Jury Waiver**

Defendant has not filed a jury waiver.

**G.    Pre-Trial Motions**

Defendant moved to suppress all evidence flowing from his arrest on September 21, 2017, by officers of the Oceanside Police Department, including his post-arrest statement and evidence obtained from his cellular phone, on the grounds that his arrest was unlawful. The motion hearing was held on August 29, 2018.  Following the testimony of three government witnesses, the Court denied the motions to suppress.

The government filed motions in limine regarding the admission of expert testimony, admission of child pornography images, admission of extraneous evidence related to 404(b), and to exclude witnesses and references regarding defendant's background and financial status.  Defendant filed a response.  At the hearing held on October 15, 2018, the Court granted the motion to admit expert testimony, and to exclude witnesses.  The Court ruled the motion regarding the admission of the child pornography images as moot, given the representations of the parties.  The Court granted in part and denied in part the motions regarding the 404(b) evidence and Defendant's background.

## II.

## STATEMENT OF FACTS

On or about September 16, 2017, a minor female (MV-1) residing in Oceanside, California, within the Southern District of California, began "chatting" online with another

individual through a mobile application called "Spotafriend."[1] In her profile on Spotafriend, MV-1 indicated she was 14 years old, which was her true age. The other individual was using the Spotafriend account "Logan121261" and the user name "Logan." "Logan" listed his age as 17 on the profile, but in the description in his profile he noted "(must be open minded) I'm actually 21." "Logan" was later identified by law enforcement, as described below, as Isaiah Smallwood-JACKSON.

Shortly after beginning their conversation, on September 16, 2017, JACKSON asked MV-1 if she read his "bio," which stated JACKSON was 21 years of age. MV-1 asked "So your 21?" JACKSON responded "Yes." MV-1 asked JACKSON if it was bad that she still wanted to "cuddle" with him. JACKSON responded, "Not at all, is it bad that I don't care about your age?"

JACKSON gave MV-1 his phone number, and the two continued their conversation using text messaging on their cellular phones. Shortly after their text conversation began, JACKSON asked MV-1 to send him pictures. MV-1 sent JACKSON three photographs of herself, in all of which she was fully clothed. JACKSON then said, "…so I know you said to not get to touchy but I'm honestly dying to kiss you." The conversation continued:

| From | Content |
|------|---------|
| MV-1 | Well I don't mind a kiss |
| JACKSON | Aww perfect (kissing emoji) |
| MV-1 | Well I don't mind you getting a little touchy now |
| JACKSON | Ahh okay, how so? Where would you like me to touch you? |
| MV-1 | Well maybe if I was in the mood.. you could touch me down there |
| JACKSON | I'm pretty sure i could get you in the mood.. would you want me to use my hands or my mouth? |
| MV-1 | Well I can only fit a finger inside of me |

<hr>

[1] Spotafriend's official website states it is an application "Built for teens" and designed "for meeting new friends." The website states the application "is not a teen dating app, it's the new way to Make friends."

| JACKSON | Ohh myy.. we might have to try to open you up a little.. are you a virgin? |
|---|---|
| | I'll send you a pic of my cock in exchange |
| MV-1 | Yeah I am |
| JACKSON | Have you ever had a tongue down there? |
| MV-1 | No I haven't but I want to really badly |
| JACKSON | I will definitely do that for you with so much pleasure |
| MV-1 | You are turning me on a little bit.. |
| JACKSON | Oh am I..? The thought of me kissing your sweet lips.. kissing down your neck.. sliding my hand up your shirt.. taking it off of you to kiss down further.. kissing across your chest.. sucking licking pleasuring each nipple… then sliding my hands between your legs slipping inside your pants.. sliding one finger inside you stretching it a little to fit another.. then fully taking your pants off kissing my way down there sliding my tongue inside you.. licking kissing sucking  loving.. |

Later in the conversation, MV-1 asked JACKSON if she could send him a photo showing a little bit of skin. MV-1 sent JACKSON a photograph of herself from the bottom of her bare breasts to the top of her eyes, with a heart emoji covering her left nipple and the right nipple not visible in the photograph. Soon after, JACKSON asked MV-1 for her address, to which MV-1 responded, "Are you sure? I don't know.." JACKSON responded, "I promise baby it will be so worth it." MV-1 told JACKSON that she was nervous, but JACKSON instructed her to "just focus on being pleasured…"

MV-1 told JACKSON that she lived in Oceanside, and eventually provided him with her address. In that same message, MV-1 told JACKSON not to come, because she was still thinking about it. MV-1 then told JACKSON that she was tired, and asked if she could go to bed.

On September 17, 2017, MV-1 and JACKSON resumed their text conversation. Shortly after the text messaging resumed, JACKSON asked, "Okay cuteness, so are you ready to loose your virginity?" To which, MV-1 responded, "Wait are we going to have sex?" JACKSON told MV-1 they would only have sex if she was ready and wanted to.

5

JACKSON asked if it was okay if he did not use a condom when they have sex. MV-1 asked JACKSON if she would get pregnant if they did not use condoms. JACKSON told her that she would not. MV-1 then asked, "Then what are condoms for then?" JACKSON replied, "For people who don't know what they're doing."

As the conversation continued, JACKSON asked MV-1 to take photographs of herself:

| From | Content |
|------|---------|
| JACKSON | Do you think you could take more pictures for me? |
| MV-1 | Sure what kind do you want? |
| JACKSON | Umm could you take some of you taking your off your cotes? Like the first pic with a shirt on then the next without the next without a bra and then down there |

MV-1 then sent JACKSON a nude photograph of herself, in which her breasts and pubic area were exposed. JACKSON stated, "Fuck baby can you open your legs for me?" MV-1 then sent JACKSON two photographs depicting close-up images of her vagina and anus.

As the conversation continued, JACKSON and MV-1 discussed meeting up once MV-1 got out of school. MV-1 asked JACKSON if they would have to have sex if they met. JACKSON told her they did not have to have sex, and said they could do anything that made her happy.

At that point, MV-1 stated multiple times that she was nervous. The conversation then continued:

| From | Content |
|------|---------|
| MV-1 | Are you nervous? Or just me lol |
| JACKSON | Lol not really I'm more excited than anything |
| JACKSON | But I'm also a military cop so nothing bothers me |
| MV-1 | Oh you are? |
| JACKSON | I amm |
| MV-1 | Oh I didn't know that's really cool |
| MV-1 | Hm are you sure that we should met? |
| JACKSON | Yes baby I'm more than sure |

| JACKSON | Can we please? |
|---------|----------------|
| MV-1 | Hm |
| JACKSON | Please baby I'll make it so worth it and I'll be able to ask you to be mine |
| MV-1 | Idk.. |
| JACKSON | Can I just come and you decide when I get there? |
| MV-1 | Hm if you want to I don't want to waste your time though |
| JACKSON | Do you really think you won't come out? |
| MV-1 | Idk I want to but I'm nervous |
| JACKSON | What can I do? |
| JACKSON | Please I'm dying to see you |
| MV-1 | I know it's hard to say yes because I only known you for 2 days over the phone |
| JACKSON | Take a leap of faith? |

MV-1 eventually agreed that JACKSON could come to her house. JACKSON texted MV-1 when he arrived at her house, and MV-1 told him to go to the side of her house. MV-1 told JACKSON that he had to be quiet. Approximately 25 minutes later, JACKSON sent MV-1 a text message stating, "I didn't hurt you did I?" MV-1 responded, "A little." JACKSON then told MV-1, "I am so sorry, next time tell me to stop and I'll stop whatever I'm doing that s hurting you."

After JACKSON departed, MV-1 reported to her sister that she had been raped. MV-1's sister called the police, who responded to the house within minutes. MV-1 reported to law enforcement that she had been sexually assaulted by JACKSON, and her cellular phone was seized as evidence. Later that same night, MV-1 was taken to Palomar Health Center and given a sexual assault examination by Kelly Valencia, R.N.

On September 21, 2017, Oceanside Police Department Detective Jonathan Boone showed MV-1 a photographic line-up. MV-1 positively identified JACKSON, who she only knew as "Logan," as the person with whom she corresponded on Spotafriend and she had sexual contact with at her house. Further, a review of MV-1's cellular phone showed a profile for "Logan" in the Spotafriend application, which included several photographs of JACKSON. Later that same day, Oceanside Police Department arrested JACKSON

and charged him with violations of the California Penal Code relating to the alleged sexual assault on MV-1 and his communications with her.

Once at the police station, Detective Boone told Jackson he was under arrest for unlawful intercourse with a minor, and then read Jackson his <u>Miranda</u> rights. Detective Boone asked Jackson if he understood those rights, to which Jackson responded "Yes." Officer Boone then asked Jackson if he wanted to talk to him, to which Jackson responded "Yeah, absolutely." After obtaining some biographical information from Jackson, Detective Boone asked Jackson if he knew why he had been arrested. Jackson responded "I texted a girl, but I didn't actually meet anybody, which is the confusing part." Jackson initially told Detective Boone he had been talking on an application called "Tinder" with a girl who he was "pretty sure" was white, and who he believed was not 18. Jackson then told Detective Boone he also talked to girls on an application called "Spotafriend" but that he had never met up with anyone. Jackson then told Detective Boone he had talked to one girl on the phone, with role playing, but that he did not know why it was a problem.

Detective Boone confronted Jackson with the information he had obtained from the victim's phone, including that he had texted with a girl on the Spotafriend application, had engaged in sexually explicit conversations with her, and had requested that she send sexually explicit images. Detective Boone showed Jackson copies of the communications downloaded from the victim's phone and read portions of the communications to him. Jackson admitted that was his account and those were their communications. However, Jackson continued to deny that he ever met the victim in person.

Detective Boone read Jackson the content of additional communications obtained from the victim's phone, including the victim providing Jackson with her address and Jackson responding by text "I'm here. Can you open it [the gate]." Detective Boone noted the texts stopped at that point for about 20 minutes, and Jackson responded, "[t]hat's when I called her" to engage in phone sex. When Detective Boone asked about the next text

Jackson sent, asking "I didn't hurt you, did I?," Jackson indicated it was all part of the fantasy.

Jackson eventually admitted he went to the victim's house, met with her, and "it went too far." Jackson admitted engaging in sexual acts, including oral copulation and digital penetration of the victim outside her home, and then returning to his home.

## III.

## WITNESSES

The United States expects to call the following witnesses, although it reserves the right to change the order of these witnesses, substitute witnesses, add, or omit one or more witnesses:

1.    MV-1[2]
2.    MV-1's father
3.    MV-1's mother
4.    MV-1's sister
5.    MV-1's sister
5.    Kelly Valencia, R.N.
6.    Oceanside Police Department Officer Mark Theriot
7.    Oceanside Police Department Officer Jon Seabron
8.    Oceanside Police Department Sergeant Jeff Novak
9.    Oceanside Police Department Detective Jonathan Boone

## IV.

## STIPULATIONS

The parties have not agreed to any stipulations.

//

//

//

---

[2] The government will provide the Court with the full list of names prior to voir dire so as to protect the privacy of the minor victim.

## V.

## EXHIBITS

An exhibit list will be provided on the day of trial, and all exhibits will be made available to the defense to review in advance of trial.  The exhibits in this case will include:

1.  Photographs of MV-1's residence

2.  Photograph of MV-1

3.  SANE Examination Records

4.  Photographs from the communications between MV-1 and Defendant

5.  Cellular Phones belonging to Defendant and MV-1

6.  Defendant's audio and video recorded confession

## VI.

## LEGAL ISSUES

**A.  Count One—Sexual Exploitation of a Minor**

Sexual exploitation of a minor under 18 U.S.C. § 2251(a) and (e), as charged in Count 1 of the Indictment, has the following elements:

1.  At the time, the person was under the age of eighteen years;

2.  The defendant employed, used, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing an image of such conduct for the purpose of producing a visual depiction of such conduct; and

3.  The visual depiction was produced using materials that had been mailed, shipped, or transported across state lines or in foreign commerce; OR knowing and having reason to know that such visual depiction would be transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce.

Committee on Model Criminal Jury Instructions - Ninth Circuit, Manual of Model Jury Instructions for the Ninth Circuit, § 8.181 [2011 Edition - West Publishing Co.].

"Sexually explicit conduct" includes both masturbation and the lascivious exhibition of the genitals or pubic area of any person. "Producing" means producing, directing, manufacturing, issuing, publishing or advertising. "Visual depiction" includes videotape or data stored by electronic means. 18 U.S.C. § 2256(2)(A)(v), (3) & (5). In order to determine whether a particular visual depiction is a "lascivious exhibition of the genitals or pubic area," a jury must consider the overall content of the visual depiction, while taking into account the age of the child depicted. The following list of factors, while not exhaustive, are among the things a jury should consider:

1. whether the focal point of the visual depiction is on the child's genitalia or pubic area;

2. whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3. whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4. whether the child is fully or partially clothed, or nude;

5. whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and

6. whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

A visual depiction need not involve all of these factors to be a lascivious exhibition, and it is for a jury to decide the weight or lack of weight to be given to any of these factors. United States v. Overton, 567 F.3d 1148 (9th Cir. 2009); *amended and affirmed*, 2009 U.S. App. LEXIS 20818 (July 14, 2009); United States v. Dost, 636 F. Supp. 828 (S.D.Cal.1986), *aff'd sub nom.* United States v. Wiegand, 812 F.2d 1239 (9th Cir.1987).

**B.     Count Two—Enticement of a Minor**

Enticement of a minor in violation of 18 U.S.C. § 2422(b), as charged in Count 2 of the Indictment, has the following elements:

1. The defendant used a facility of interstate or foreign commerce;

2. The defendant knowingly persuaded or induced or enticed or coerced a minor to engage in sexual activity;

3. This sexual activity would violate California law; and

4. The minor was less than eighteen years old at the time.

Here, the underlying criminal offenses for which defendant can be charged, as alleged in the indictment, are violations of California Penal Code §§ 288a and 289(h). California Penal Code § 288a provides: "(b)(1)… [A]ny person who participates in an act of oral copulation with another person who is under 18 years of age shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year. California Penal Code § 289(h) provides: ". . . [A]ny person who participates in an act of sexual penetration with another person who is under 18 years of age shall be punished by imprisonment in the state prison or in a county jail for a period of not more than one year." The fact that the underlying sexual conduct would be a misdemeanor under state law does not bar its use under § 2422(b). "Congress's repeated use of the word 'any' suggests that Congress intended the statute's reach to be broad." *United States v. Shill*, 740 F.3d 1347, 1352 (9th Cir. 2014) (upholding application of § 2422(b) to an attempt to entice a minor to engage in sexual conduct that would be a misdemeanor if completed under state law).

**C.  Use of Medical Records Pursuant to Rule 703**

The United States may introduce testimony from expert medical personnel in this case. Medical personnel may rely upon medical records which have been prepared by other doctors and/or hospital employed social services persons and may properly testify regarding the content of such medical records.

The medical records in question may be admissible themselves pursuant to Fed. R. Evid. 803(4), statements made for medical diagnosis or treatment, and Fed. R. Evid. 803(6), records of a regularly conducted activity. Even if such records are not admissible

in evidence, the Government submits that the medical personnel may rely upon them in making any opinions, pursuant to Fed. R. Evid. 703. Fed. R. Evid. 703 states:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, they proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

For these reasons, the Government submits that, if called, medical personnel may properly testify regarding the content of the relevant medical records.

**D.    Statements Made by Victim to Medical Personnel Are Admissible Hearsay**

Rule 803(4) of the Federal Rules of Evidence allows for the admission of hearsay statements made to medical personnel. Rule 803 states, in part:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
> . . .
>
> (4)  **Statement Made for Medical Diagnosis or Treatment.** A statement that:
>> (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and
>> (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

Fed. R. Evid. 803(4). Pursuant to Fed. R. Evid. 803(4), the availability of the declarant is immaterial. This is a firmly rooted hearsay exception and evidence admitted pursuant to the exception does not violate the Confrontation Clause. *See Guam v. Ignacio*, 10 F.3d 608, 612 (9th Cir. 1993). "The rationale for the exception is that the patient can be expected to tell the truth about her injury because she will want to be diagnosed correctly and treated appropriately." *Id*. at 613.

The exception applies to physical and non-physical treatment and diagnosis (i.e. emotional and psychological injuries.) *Id*. at 613. The statements are admissible when they are "reasonably pertinent" to the treatment of the victim. *United States v. Pacheco*, 154 F.3d 1236, 1242 (10th Cir. 1998).

The Ninth Circuit has held that "[g]enerally, statements of fault are not admissible under this exception. However, this Circuit has adopted a special rule for sexual abuse cases because sexual abuse involves more than physical injury; the physician must be attentive to treating the victim's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser." *United States v. Yazzie*, 59 F.3d 807, 812 (9th Cir. 1995) (internal citation omitted). In *United States v. Longie*, 984 F.2d 955, 959 (8th Cir. 1993), the Eighth Circuit held that statements made regarding the identity of the abuser were admissible because identification affected the physician's treatment and recommendation for counseling. As a result, a child victim's statements identifying the perpetrator of the sexual abuse are admissible, when the statements are made for the purpose of medical treatment and diagnosis. *See Yazzie*, 59 F.3d at 812.

Earlier this year, the Ninth Circuit affirmed the admission of statements made by a developmentally delayed 11-year-old sex abuse victim to a nurse practitioner who was conducting a sexual assault examination. *United States v. Kootswatewa*, 893 F.3d 1127 (9th Cir. 2018). In *Kootswatewa*, the victim's statements about her sexual assault, including identifying facts of the defendant, were admissible under hearsay exception for statements made for purposes of medical diagnosis or treatment. *Id*. at 1132-35. In order to diagnose and treat victim's injuries, the nurse practitioner first had to find out what happened to her, and so she asked victim if something happened. *Id.*

Statements that are admissible pursuant to Fed. R. Evid. 803(4) need not necessarily have been made to a physician or nurse. *United States v. Tome*, 61 F.3d 1446, 1451 (10th Cir. 1995) (reversed on other grounds). Statements to hospital attendants, ambulance

drivers or family members may be included, depending on the circumstances of the statement. *Id.*

Finally, statements made by the parent, guardian or caretaker of the victim regarding the nature and perpetrator of the injuries may be admissible under this exception when the proponent shows that the statements were made for the purpose of medical diagnosis or treatment. *United States v. Yazzie*, 59 F.3d 807, 813 (9th Cir. 1995).

**E.    Statements Made by the Victim may be Admissible Pursuant to Fed. R. Evid. 803(1), 803(2), and 803(3) as Present Sense Impressions, Excited Utterances and Existing Physical Condition**

Statements which describe or explain an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, are admissible as present sense impressions.  An example is a victim's complaint of pain.  The rationale is that a statement which is made contemporaneously with an event serves as proof of the declarant's sincerity. These statements may be admitted into evidence under Federal Rules of Evidence 803(1) (present sense impression) and 803(3) (then-existing mental, emotional, or physical condition).

Rule 803(1) provides an exception to the hearsay rule for "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."  Fed. R. Evid. 803(1).

Rule 803(3) provides an exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will."  Fed. R. Evid. 803(3).

In *Guam v. Ignacio*, 10 F.3d 608, 614 (9th Cir. 1993), the victim's sister's testimony that the victim would not allow her to wash her vaginal area, complaining that her "pee-

pee hurt," came within the present sense impression exception to the hearsay rule and was properly admitted.

The statements may also be considered excited utterances, pursuant to Rule 803(2). For a statement to be admitted under Rule 803(2), two requirements must be met: "First, there must be some occurrence or event sufficiently startling to render normal reflective thought processes inoperative. Second, the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought." *United States v. McLennan*, 563 F.2d 943, 948 (9th Cir. 1977) (quoting McCormick on Evidence (2d ed.) § 297), cert. denied, 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 60 (1978); *see also United States v. Iron Shell*, 633 F.2d 77 (8th Cir. 1980), cert. denied, 450 U.S. 1001 (1981); *United States v. Zizzo*, 120 F.3d 1338, 1355 (7th Cir. 1997). Under this exception, the statement need not be contemporaneous with the event, but with the excitement caused by the event. *Guam*, 10 F.3d at 614-15 (statement to babysitter about one hour after assault admitted).

Statements admitted under the excited utterance exception may be broader in scope than those admitted under the present sense exception. A present sense statement must be a description or explanation of the event, while an excited utterance exception need only relate to a startling event. An excited utterance may be admissible if made in response to questioning, *People of Guam v. Cepeda*, 69 F.3d 369, 372 (9th Cir. 1995), or if the statement contains an opinion or is non-factual. *Woodward v. Williams*, 263 F.3d 1135, 1141 (10th Cir. 2001).

The United States will offer testimony regarding statements made by the victim to family members regarding her then-existing state of mind and physical condition, as well as testimony by the responding officers regarding the victim's demeanor and physical condition. This testimony is admissible under Rule 803(3).

//

//

**F.     Leading Questions are Permissible on Direct Examination to Develop Testimony**

Federal Rule of Evidence 611 recognizes the need to allow leading questions in some circumstances.  Rule 611 allows the court to exercise reasonable control over its court for the effective presentation of evidence:

> (a) Control by the Court; Purposes.  The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:
> > (1) make those procedures effective for determining the truth;
> > (2) avoid wasting time; and
> > (3) protect witnesses from harassment or undue embarrassment.
>
> …
>
> (c) Leading Questions.  Leading questions should not be used on direct examination except as necessary to develop the witness's testimony.  Ordinarily, the court should allow leading questions:
> > (1) on cross-examination; and
> > (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.

Fed. R. Evid. 611.  The Advisory Committee Notes to Rule 611 provide that leading questions should not be used except where necessary to develop the witness' testimony. Fed. R. Evid. 611, Advisory Committee Notes, 1972 Proposed Rules, Note to Subsection (c).  The Advisory Committee noted, however, that asking leading questions of child witnesses is a recognized exception to the general rule.  *Id*.

A district court's decision to permit leading questions is reviewed for an abuse of discretion.  *United States v. Castro-Romero*, 964 F.2d 942, 943 (9th Cir. 1992).  Reversal on the basis of improper questions is required "only if the 'judge's actions . . . amounted to, or contributed to, the denial of a fair trial.'"  *Id.* (quoting *Miller v. Fairchild Industries*, 885 F.2d 498, 514 (9th Cir. 1989)).

In *United States v. Archdale*, 229 F.3d 861 (9th Cir. 2000), the court held that leading questions of a 7-year-old child sexual abuse victim were proper when the child was clearly "having difficulty testifying about [a] very personal matter."  *Archdale*, 229 F.3d at 866.

In *Archdale*, the court also noted that use of an anatomical drawing was properly permitted. *Id*. The court cited to Title 18 U.S.C. § 3509(l) which allows child victims and witnesses to use anatomical dolls, puppets, drawings, mannequins or any other demonstrative device that the court deems appropriate in developing the child's testimony. *Id*.

Similarly, in *United States v. Castro-Romero*, 964 F.2d 942, 944 (9th Cir. 1992), the court held that leading questions of the 8-year-old child sexual abuse victim were properly allowed. Other courts have similarly held that leading questions are permissible. *See United States v. Brady*, 579 F.2d 1121, 1130 (9th Cir. 1978) (noting in dicta that leading questions of minor witnesses is "not an unusual practice."); *Rotolo v. United States*, 404 F.2d 316, 317 (5th Cir. 1968) (affirming use of leading questions for nervous and upset 15-year-old witness); *Antelope v. United States*, 185 F.2d 174, 175 (10th Cir. 1950) (allowing leading questions on direct examination of a minor statutory rape victim.)

Additionally, leading questions are routinely permissible to develop foundation. Thus, questions that orient the witness to time, place or event are permissible as foundational questions. For example, the question, "Did someone touch you?" does not suggest an answer and thus, technically is not leading. However, even if considered to be a leading question, the question is foundational, merely asked to direct the witness' attention to the area of inquiry. Once the question has been answered, additional non-leading and follow-up questions can be asked such as "Who?" "How?" and "Where?".

The analysis regarding leading questions is similar to the analysis for using leading questions on direct examination of persons who suffer from a mental infirmity or have language barriers. Rule 611 specifically allows the court wide latitude to recognize when a witness is suffering from a difficulty in communicating and allows for the use of leading questions in such circumstances. Fed. R. Evid. 611. If necessary, the United States will use leading questions to develop foundation, and if necessary during the testimony of MV-1.

//

# VII.

## <u>VOIR DIRE</u>

The United States requests that the following voir dire questions be addressed to the jury panel in addition to the Court's standard jury instructions:

1.     Of those of you who have sat on criminal juries, did you reach a verdict?

2.     Has anyone had an unpleasant experience with any law enforcement personnel?

3.     Has anyone had any disputes with any agency of the United States' Government? How about Oceanside Police Department? Or any other law enforcement agencies?

4.     Have you, your relatives, or your close friends been investigated, arrested, accused, or charged with a crime? Specifically, a sex crime or any crime involving children?

5.     Does everyone understand that, as a juror, your duty is to apply the law regardless of whether you agree or disagree with it?

6.     Does everyone understand that, as a juror, you are not to consider prejudice, pity, or sympathy in deciding whether Defendant is guilty or not guilty?

7.     Does anyone think that, regardless of the strength of the evidence, they will have trouble deciding whether Defendant is guilty or not guilty? Does anyone think they cannot decide whether a person is guilty or not guilty?

8.     Does anyone have religious or moral beliefs which will make it difficult for them to make a decision strictly based on the law and facts of this case?

9.     Do any of you believe that a person should be permitted to look at or do anything in the privacy of their home or on the Internet without getting into trouble?

10.    Defendant in this case is charged with a federal offense that involves the production of images involving minors engaged in sexually explicit conduct. I refer to this law using specific terms because these terms have a very particular meaning. For example

"minor," means a person less than 18 years of age. "Sexually explicit conduct" has a very specific meaning. But for the purpose of this voir dire examination, I am going to refer to the offense charged with the more familiar, short-hand characterization: "child pornography." Do any of you believe that producing, possessing, downloading or viewing child pornography should not be against the law?

11.     If selected as a juror, you will have to view images of minors engaged in sexual conduct and/or hear descriptions of what is depicted in the images.  These images may be distasteful, offensive, and unpleasant to view.  However, the prospect of having to see distasteful, offensive or unpleasant evidence is not a basis to avoid the responsibility of jury service. Many cases, both criminal and civil, involve unpleasant things.  If we excused prospective jurors on the ground that jury duty makes demands - including some unpleasant demands - then we could not function.  Moreover, the parties have the right to expect that prospective jurors will not seek to avoid jury service simply because they would rather not serve, or because they would like to avoid unpleasantness.   Having said that, is there anyone who believes there is some compelling reason why he or she could not be an impartial juror - that is to consider all of the evidence and follow the  law - because  images depicting  child  pornography  will  be presented as evidence in the trial?

12.     Some people are of the mistaken belief that possessing child pornography is an activity that is protected by the Free Speech Clause of the First Amendment to our Constitution, or may otherwise be constitutionally protected activity.  I tell you that - as a matter of law - this is not the case. Congress has passed laws which make it a criminal offense to possess child pornography, and such activity is not protected by the First Amendment or by any other Constitutional right. Before I informed you just now that the possession of child pornography was not constitutionally protected conduct, is there anyone who believed that it was?

13.     Does anyone believe that such activity should be protected by the First Amendment to the United States Constitution as free speech, or by any other provision of the Constitution?

14.     Even if you believe such activity should be protected by the First Amendment, is there anyone who would have difficulty abiding by my instruction to you that such activity is not - as a matter of law - protected by the First Amendment to the United States Constitution or by any other provision of the Constitution?

15.     Does anyone believe that a minor can legally consent to sex regardless of the law stating that they cannot legally consent?

16.     How many of you use computers on a daily basis?  Do any of you have any specialized computer knowledge such as working in an IT department or in computer forensics or specialized computer training such as a degree or certification in a related subject?

The United States respectfully reserves the right to submit additional questions prior to trial.

## VIII.

## **JURY INSTRUCTIONS**

The United States will file its proposed jury instructions under separate cover.  The United States anticipates that the majority of its proposed instructions will be taken from the Committee on Model Criminal Jury Instructions - Ninth Circuit, Manual of Model Jury Instructions for the Ninth Circuit.

Date:  October 16, 2018          ADAM L. BRAVERMAN
                                 United States Attorney

                                 */s/ Amanda L. Griffith*
                                 Janet A. Cabral
                                 Amanda L. Griffith
                                 Assistant U.S. Attorneys
                                 Attorneys for the United States

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED THAT:

I, Amanda L. Griffith, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of the United States' Trial Memorandum and this Certificate of Service on all parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: October 16, 2018

*/s/ Amanda L. Griffith*
AMANDA L. GRIFFITH
Assistant U.S. Attorney
